**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| CINDY KEMPHER, | : | Case No. 3:14-cv-320 |
| | : | |
| Plaintiff, | : | District Judge Thomas M. Rose |
| | : | |
| vs. | : | Chief Magistrate Judge Sharon L. Ovington |
| | : | |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY, | : | |
| | : | |
| Defendant. | : | |

═══════════════════════════════════════

**REPORT AND RECOMMENDATION[1]**

═══════════════════════════════════════

This Social Security disability benefits appeal is before the Court on Plaintiff's

statement of errors (Doc. 7), the Commissioner's memorandum in opposition (Doc. 10),

Plaintiff's reply (Doc. 11), the administrative record (Doc. 6), and the record as a whole.

At issue is whether the Administrative Law Judge ("ALJ") erred in finding Plaintiff "not

disabled" and therefore not entitled to disability insurance benefits ("DIB") and

supplemental security income ("SSI").  (*See* Doc. 6, PageID ## 69-82 (the "ALJ's

decision")).

## I.  INTRODUCTION

Plaintiff Cindy Kempher protectively filed applications for a period of disability,

DIB, and SSI on September 28, 2011.[2]  (Doc. 6, PageID # 72).  Plaintiff alleges that she

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendation.

has been unable to work since November 19, 2006 due to anxiety, depression, anemia, difficulty concentrating, back problems, and complications from gastric surgery. (*Id.* at 140). Her claims were denied initially and on reconsideration. (*Id*. at 72).

Plaintiff requested a hearing before an ALJ, which was held on December 20, 2012. (Doc. 6, PageID # 72). Plaintiff and a vocational expert ("VE") testified, with Plaintiff's counsel in attendance. (*Id.*) On February 13, 2013, the ALJ issued an unfavorable decision, finding that Plaintiff had not been under a disability as defined in the Social Security Act during the period from November 19, 2006 through February 13, 2013, and was therefore not entitled to a period of disability, DIB, or SSI. (*Id.* at 61). The ALJ found that Plaintiff had the residual functional capacity ("RFC")[3] to perform a full range of work at all exertional levels, but with certain non-exertional limitations. (*Id.* at 77-80). Based on Plaintiff's age, education, work experience, and RFC, the ALJ found that there were a significant number of jobs in the national and regional economy that Plaintiff could perform. (*Id*. at 80-81). Therefore, the ALJ concluded that Plaintiff was not disabled. (*Id.* at 73). The decision became final and appealable on July 30, 2014, when the Appeals Council denied Plaintiff's request for review. (*Id*. at 61). Plaintiff now seeks judicial review pursuant to section 205(g) of the Social Security Act (the "Act"). 42 U.S.C. §§ 405(g), 1383(c)(3).

---

[2] The Court notes that Plaintiff filed her applications with the Social Security Administration under the name Cynthia Marie Kempher.

[3] A claimant's RFC is an assessment of "the most [he] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1).

At the time of the hearing, Plaintiff was 55 years old and had a high school diploma.  (Doc. 6, PageID # 87).  Additionally, she completed some special job training courses at the community college.  (*Id.* at 92-94).  Prior to the hearing, Plaintiff worked as a blow molding machine operator and molding supervisor.  (*Id*. at 80, 118).  However, based on the VE's testimony, the ALJ found that Plaintiff's functional limitations precluded her from returning to her past relevant work.  (*Id.*)

The ALJ's "Findings," which represent the rationale of her decision, are as follows:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2012 (Exhibit 6D).

2. The claimant has not engaged in substantial gainful activity since November 19, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: depression and anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: unskilled work as defined by the Dictionary of Occupations Titles, work that is low stress work – defined as work that is not fast paced and with no assembly line production quotas.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on June 24, 1957 and was 49 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from November 19, 2006 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Doc. 6, PageID ## 74-81).

In sum, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Regulations and was therefore not entitled to a period of disability, DIB, or SSI. (*Id.* at 81).

On appeal, Plaintiff argues that: (1) the ALJ erred in finding that Plaintiff did not have a severe physical impairment; (2) the ALJ erred in finding that Plaintiff was not disabled by her mental impairments, or, at the very least, the combination of her mental and physical impairments; and (3) the ALJ erred in finding that Plaintiff was not credible. (Doc. 7 at 1).

## II. STANDARD OF REVIEW

The Court's inquiry on appeal is limited to whether the ALJ's non-disability finding is supported by substantial evidence and whether the correct legal standard was applied. 42 U.S.C. § 405(g); *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). Substantial evidence is more than a "mere scintilla" but less than a preponderance of the evidence. *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). In reviewing the ALJ's decision, the district court must look to the record as a whole and may not base its decision on one piece of evidence while disregarding all other relevant evidence. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). Even if the district court "might have reached a contrary conclusion of fact, the [ALJ's] decision must be affirmed so long as it is supported by substantial evidence." *Kyle*, 609 F.3d at 854-855 (citing *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 604-05 (6th Cir. 2009)).

The claimant bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). That is, she must present sufficient evidence to show that, during the relevant time period, she was unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment, or combination of impairments, which has lasted or is expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A).

### III.  BACKGROUND

The relevant facts, as reflected on the record, are as follow:

### A.  Physical and Mental Impairments

Beginning in November 2005 (prior to her onset date) and continuing through mid-2007, Plaintiff received mental health treatment and medication management at Century Health.  (Doc. 6, PageID ## 424-28).  Plaintiff's diagnoses included generalized anxiety disorder, panic disorder without agoraphobia, substance abuse mood disorder (rule out bipolar disorder), alcohol dependence, and marijuana abuse in remission.  (*Id.* at 425).

In August 2007, Plaintiff began serving an eight-month sentence of imprisonment, having been previously convicted for her involvement in a felony theft offense.  (Doc. 6, PageID # 517).  In November 2007, during her incarceration, Plaintiff began to receive mental health treatment in the prison facility.  (*Id.*)  According to her prison records, Plaintiff's diagnosis included major depression recurrent, polysubstance dependence, rule out bipolar affective disorder and anxiety disorder, and anemia.  (*Id.* at 514).  Her prison records indicate that she had a history of entering drug detoxification programs on at least four prior occasions.  (*Id.* at 519).  She was described as tearful during examinations and, on one occasion, was said to display depressed psychomotor skills, keeping her head down with an odd presentation, and was thought to possibly be manipulative. (*Id.* at 496, 500, 517-518, 522, 533, 537-538).

On October 16, 2008, Plaintiff was treated at Miami Valley Hospital for bilateral heel pain, caused by heel spurs and plantar fasciitis in the right foot.  (*Id.* at 569).  She

reported the pain was worse if she stood for long periods of time.  (*Id.* at 567).  Her gait

was observed to be slow, but steady.  (*Id.*)  In terms of treatment, Plaintiff was instructed

in exercises and home massage therapy, and was given heel cups and medication. (*Id.* at

569).

From August 3, 2010 through November 28, 2010, Plaintiff was treated by Dr.

Daniel Brumfield.  (Doc. 6, PageID # 576-77).  Dr. Brumfield did not provide any

medical records or examination notes, and merely completed the general agency form.

(*Id.*)  In completing the form, Dr. Brumfield's answers indicate that "**[Patient] stated** she

has had [right] shoulder pain for 1yr.  **[Patient] stated** she doesn't want to get out of bed

because of depression and feeling overly anxious."  (*Id.* at 576) (emphasis added).  He

also indicated that Plaintiff was taking Vicodin for shoulder pain, Xanax for anxiety, and

Cymbalta for depression, and that she was responding well to prescription drug therapy.

(*Id.* at 577).  Dr. Brumfield further stated, without elaboration or evidentiary basis, that

Plaintiff could not push, pull, or lift more than five pounds, that she is unable to

communicate clearly or relate to others, and that her psychological state makes her unable

to follow instructions.  (*Id.*)

From October 2008 through December 2010, Plaintiff was treated at a clinic in

Dayton where she was seen by multiple physicians.  (Doc. 6, PageID ## 617-31).  On

numerous occasions, the office treatment notes indicate Plaintiff's repeated efforts to

obtain Xanax and Vicodin.  (*Id.*)  Plaintiff's patient profile indicates "Drug-Seeking

Behavior" and notes "DO NOT PRESCRIBE CONTROLLED SUBSTANCES."  (*Id.* at

630).  During several visits, Plaintiff indicated to her doctors that she was illegally

7

purchasing Xanax on the street and would continue to do so until someone prescribed the medication to her.  (*Id.* at 620, 624, 626, 627).  Multiple physicians noted that Plaintiff became emotional, upset, and even hostile when she was informed that they would not prescribe Xanax or Vicodin to her.  (*Id.* at 624-627).  Additionally, it was frequently noted that Plaintiff was not following through on recommended mental health therapy and was not filling her prescriptions for depression and anxiety, which she claimed was due to her financial circumstances.  (*Id.* at 618-21, 24-27).  However, her physicians noted the inconsistency of Plaintiff's allegations that she could not afford to seek recommended treatment or to fill legitimate prescriptions, and yet she was able to purchase Xanax on the street and to maintain an expensive pack-a-day smoking habit. (*Id.* at 618-21, 24-27).  As to her physical impairments, the treatment records indicate that Plaintiff complained of pain in her lower back, feet/heels, and wrists.  (*Id.* at 619-22, 624-27).  However, physical examinations revealed "5/5 muscle strength of upper and lower extrem[ities]" in February 2010, "full range of motion in all extremities … [f]ull and painless lumbosacral range of motion … [normal c]ervical, thoracic and lumbar spine exam [] without tenderness…" in January 2010, "[n]o back pain" in July 2009, and "normal ROM of both feet and ankles" with "[g]ait normal" in October 2008.  (*Id.* at 621, 622, 623, 627).  The notes further indicate that Plaintiff's bloodwork revealed vitamin D deficiency and anemia.  (*Id.* at 619, 623, 625).

On February 4, 2011, Dr. Donald Kramer, a psychologist, evaluated Plaintiff at the request of the Bureau of Disability Determination ("BDD").  (Doc. 6, PageID # 585).  Dr. Kramer observed that Plaintiff was adequately dressed and groomed, and arrived on-time

to her appointment, having been dropped off by a friend. (*Id.* at 588). Dr. Kramer noted that Plaintiff appeared depressed, tearful, fatigued, and exhibited some psychomotor retardation. (*Id.*) Further, Plaintiff was slow in her thought, speech, and response time, and displayed significant hesitations in her speech. (*Id.*) Dr. Kramer wrote that Plaintiff "certainly comes across as a woman with poor stress tolerance and poor frustration tolerance who does appear to be very fatigued." (*Id.*) He noted that Plaintiff's responses to questions were consistent, although very vague, and "[s]he struggled to provide specific information about her symptoms and their impact upon her functioning." (*Id.*) Dr. Kramer also noted that Plaintiff was vague in describing her activities of daily living. (*Id.* at 590). Plaintiff stated that she has difficulty getting out of bed, but also stated that she drives her boyfriend, her boyfriend's mother, and other people around during the day. (*Id.*) Further, Plaintiff acknowledged being "okay" with public interaction. (*Id.* at 586).

Dr. Kramer's notes indicate that Plaintiff complained of anxiety, depression, and panic attacks. (*Id.* at 585). She stated that she does not want to leave her room, gets overwhelmed by even mild stressors, and that her psychological problems have interfered with her job performance in the past. (*Id.*) However, Plaintiff believed that her physical impairments were the main source of her work limitations. (*Id.* at 587). As to physical symptoms, Dr. Kramer reports that Plaintiff gave a history of chronic back and leg pain. Plaintiff stated that she had difficulty standing or walking far. (*Id.* at 585). Plaintiff also stated that she had gastric bypass surgery in 2000 and had problems with diarrhea and malabsorption since then, causing her to have severe fatigue and lack of energy. (*Id.*)

In sum, Dr. Kramer stated that, Plaintiff's ability to relate to others appeared to be markedly impaired based on her presentation during the examination; her ability to understand, remember, and follow instructions may be moderately impaired; her ability to maintain attention, concentration, and persistence to perform simple and repetitive tasks appeared to be markedly impaired; and her ability to deal with work stress and pressures associated with day-to-day work activities appeared to be markedly impaired. (*Id.* at 592). However, Dr. Kramer opined that Plaintiff did have the mental ability to perform simple and repetitive tasks if it did not involve too much social interaction. (*Id.* at 593). Dr. Kramer also noted that Plaintiff had the mental ability to adequately manage her own funds. (*Id.*)

On January 26, 2011, Dr. Damian Danopulos evaluated Plaintiff at the request of the BDD. (Doc. 6, PageID #595). Plaintiff complained of low back pain, right shoulder pain, bilateral feet pain, right sided carpal tunnel syndrome, problems post-gastric bypass surgery with anemia and vitamin deficiency, and depression with anxiety. (*Id.* at 596). Dr. Danopulos' examination notes state, "[u]pper and lower extremities revealed full range of motion. Right shoulder revealed normal but painful motions. Right hand was normal and painless. Thenar muscles were normal. She showed close to 1+ varicosities in both legs without edema and no pain in both feet by palpation." (*Id.*) Additionally, "[m]usculoskeletal evaluation revealed a normal gait without ambulatory aids. Spine was painful to pressure in the coccygeal area. She was getting on off the examining table without difficult. Bilateral straight leg rising was normal. Squatting and arising from squatting was normal … Toes and heel gait was normal." (*Id.* at 597). A lumbar spine x-

ray *did* reveal "mild spondylosis at L3-L4 [and] [q]uestion of degenerated disc L5-S1," but "otherwise negative lumbo/sacral spine."  (*Id.* at 598).  And notably, Plaintiff's "LS spine motions were normal and practically painless."  (*Id.*)  Plaintiff's manual muscle testing also revealed normal function throughout.  (*Id.* at 601-604).

Regardless of the unremarkable examination results, Dr. Danopulos listed the following objective findings:  "1) Lumbar spine arthralgias, 2) bilateral feet neuralgias, 3) right shoulder arthralgias, 4) history of right sided carpal tunnel syndrome which could not be documented on this examination, 5) previous satisfactory gastric bypass surgery … with tendency for anemia and vitamin deficiency mostly B12 due to diminished stomach pouch, 6) depression."  (*Id.* at 600).  Dr. Danopulos then opined that Plaintiff's ability to perform work-related activities was "affected in a negative way from her lumbar spine arthralgias plus right shoulder arthralgias and her weight loss due to gastric bypass surgery which triggered tendency for vitamin deficiency and anemia."  (*Id.*)

In February 2011, reviewing psychologist, Caroline Lewin, Ph.D., and reviewing physician, Gerald Klyop, M.D., provided assessments at the request of the State agency. (Doc. 6, PageID ## 131-154).  The assessments state that Plaintiff's allegations about the intensity, persistence, and functionally limiting effects of the symptoms were not substantiated by the objective medical evidence alone.  (*Id.* at 147).

As to psychological impairments, Dr. Lewin states that Plaintiff is moderately limited in her ability to concentrate for extended periods of time, perform at a consistent pace, interact socially, and to get along with coworkers and peers without distracting others.  (*Id.* at 166-67).  Further, she opined that Plaintiff "[m]ight need extra breaks to

calm down," and "could be distracting to others with her crying but is actually cooperative most of the time." (*Id.* at 166-67).  However, Dr. Lewin notes that Plaintiff "may be manipulative because her presentation was much better at the IM exam than the Psych exam" and "her behavior is not consistent from setting to setting." (*Id.* at 136).  Accordingly, "functional conclusions [were] not given much weight." (*Id.*)  Dr. Lewin opines that Plaintiff "should be able to handle simple instructions and concentrate in routine settings where she is away from a lot of people." (*Id.*)

As to physical assessment, Dr. Klyop found Plaintiff's statements regarding her symptoms to be only 'partially credible' in light of the total medical and non-medical evidence in the file. (*Id.* at 148).  For example, Plaintiff claimed to have bilateral foot pain yet both feet were painless by palpation on examination, and Plaintiff's claims of right shoulder were only evident in painful motions. (*Id.*)  Also, the record did not support allegations of pain in Plaintiff's right hand and, in fact, her thenar muscles were normal. (*Id.*)  However, Dr. Klyop found Plaintiff may be limited to occasionally reaching overhead with her right arm due to arthralgias and painful range of motion. (*Id.* at 149).  He further opined that Plaintiff could occasionally lift/carry up to fifty pounds and frequently lift/carry up to twenty five pounds in an eight hour day. (*Id.*)  Finally, he stated that she could stand/walk for six hour and sit for six hours in an eight hour day, and that she had no postural limitations. (*Id.*)

Upon reconsideration, Drs. Robelyn Marlow and Maria Congbalay affirmed Drs. Lewin and Klyop's initial assessments. (*Id.* at 181, 184).

On November 28, 2011, and again on April 2, 2012, Erin McConnell, M.D., one of Plaintiff's treating physicians at the East Dayton Health Center, completed two Basic Medical forms for the Ohio Department of Job and Family Services, in which she opined that Plaintiff had no limitations in her ability to sit, she could stand/walk for 3-4 hours, and she could occasionally lift up to 10 pounds. (*Id.* at 696). According to Dr. McConnell, Plaintiff was not significantly limited in her ability to bend or handle, but was markedly limited in her ability to push/pull and reach. (*Id.*) Dr. McConnell indicated that Plaintiff's limitations were expected to last between eight and eleven months. (*Id.* at 694, 696). Dr. McConnell concluded that the "**above estimates [are] per [patient]** by asking her to estimate [the] extent her health problems limit her ability to perform above activities." (*Id.* at 696) (emphasis added).

Additional record evidence of note includes Plaintiff's visit to the emergency room on January 29, 2012 for left shoulder and neck pain. (*Id.* at 679). On examination, it appeared that Plaintiff had increased tightness and tenderness in her left cervical paraspinal muscles, left shoulder decreased range of motion, and muscle spasms. (*Id.*) However, x-rays of the cervical spine and of the left shoulder were negative. (*Id.*)

### B. Plaintiff's Testimony

As to her physical impairments, Plaintiff testified that she is unable to stand due to back problems and heel spurs. (Doc. 6, PageID# 97). Plaintiff also testified to suffering from carpal tunnel syndrome in both wrists, which "flares up" from overuse. (*Id.* at 98). Plaintiff estimated she can walk approximately 2-3 blocks, stand for 5 minutes, and lift 5-10 pounds at one time. (*Id.* at 98-99).

At the time of the hearing, Plaintiff lived with her boyfriend's mother. (*Id.* at 91). Plaintiff stated that she is allowed to stay in the home because she agreed to help remodel the bathroom. (*Id.* at 102). She testified that she typically does not cook, but uses the microwave to heat frozen dinners and that she goes grocery shopping at the beginning of the month. (*Id.* at 108-09). Plaintiff further testified that she did not own a car, but has a driver's license and does all of the driving for the household. (*Id.* at 92, 110).

As to her mental impairments, Plaintiff testified that she suffers from depression. (*Id.* at 103). Additionally, Plaintiff stated that she has panic attacks approximately once every two weeks, and that the attacks last between five to twenty minutes. (*Id.* at 103). The panic attacks cause her to shake and to have difficulty breathing and thinking. (*Id.*) Plaintiff testified that when she is not having a panic attack, she can "slowly" feed and dress herself. (*Id.* at 105). Plaintiff also stated that she suffers from anxiety, that she does not like loud noises, and that she is "so tired and anemic that [she] can't get out of bed hardly." (*Id.*)

Plaintiff also addressed questions regarding her drug and alcohol use. She testified that she began having problems with alcohol after her father passed away in December 2003. (*Id.* at 94). However, Plaintiff stated that in December 2005, she was taken to rehabilitation after falling in her driveway, and that she has not had a drink since then. (*Id.* at 94-95). Plaintiff testified that she has never used illegal drugs and or been addicted to prescription medication, despite statements in the record to the contrary. (*Id.* at 96-97). Plaintiff stated that her boyfriend was addicted to cocaine, which led to the theft offense in 2007, resulting in Plaintiff's incarceration based on her involvement.

14

(*Id.*)  At the time of the hearing, Plaintiff was taking Vicodin due to recent dental surgery and had taken two the morning of the hearing.  (*Id.* at 103-04).  Plaintiff also stated that she smokes one pack of cigarettes per day.  (*Id.* at 106).

### C.  The VE's Testimony

The VE testified that Plaintiff's past relevant work included her job as a blow molding machine operator (light, semi-skilled) and molding supervisor (light, skilled).  (Doc. 6, PageID #118).  At the ALJ's request, the VE provided examples of unskilled jobs at both medium and light exertional levels.  (*Id.* at 118-19).  The VE testified that, cumulatively, there were approximately 40,900 medium, unskilled jobs in the national economy (*e.g.*, groundskeeper, laundry worker, machine presser), and 38,400 light, unskilled jobs (*e.g.*, housekeeping, office helper, routing clerk).  (*Id.*)  Additionally, the VE stated that an individual with no mental health limitations who is restricted to light or medium exertion jobs could do Plaintiff's past relevant work.  (*Id.* at 119).  However, if an individual were limited to low stress work that would preclude Plaintiff's prior position as a blow molding machine operator, which is fast paced.  (*Id.*)  Finally, Plaintiff's counsel inquired as to the impact of adding limitations requiring seated breaks every thirty minutes, no more than three to four hours standing during an eight hour day, and only occasionally lifting a maximum of ten pounds.  (*Id.*)  The VE testified that "medium and light, unskilled work would be ruled out [but] [t]here would, however, be sedentary, unskilled jobs which would fit th[ose] restrictions."  (*Id.* at 120).

### D.  The ALJ's Decision

The ALJ relied on the assessment of the BDD doctors and found that Plaintiff's anxiety and depression were severe impairments.  (Doc. 6, PageID # 74).  However, the ALJ found that Plaintiff does not have any severe physical impairments.  (*Id.* at 75). After careful consideration of the record, the ALJ noted that regardless of Plaintiff's allegations of pain throughout the record, "[c]linical examinations of [Plaintiff] have consistently shown no significant physical findings."  (*Id.*)

Considering Plaintiff's severe mental impairments, the ALJ found that Plaintiff had the RFC to perform a full range of unskilled work at all exertional levels but with the non-exertional limitation of "low stress work – defined as work that is not fast paced and with no assembly line production quotas."  (*Id.* at 77).  Based upon this RFC and the VE's testimony, the ALJ found that there were a significant number of jobs in the national economy that Plaintiff could perform and that she was, therefore, not 'disabled' as defined under the Social Security Act.  (*Id.* at 77-78).

## IV.  ANALYSIS

### A.  Severe Physical Impairments

Plaintiff asserts that the ALJ erred in determining that Plaintiff did not have any severe *physical* impairments.  (Doc. 7 at 9).  Specifically, Plaintiff argues that the record reflects ongoing issues of pain in Plaintiff's shoulder and lumbar spine, including "tenderness, sometimes described as marked; limited range of motion of her shoulder; edema; muscle spasms; and positive joint pain on exams."  (*Id*. at 10).  Plaintiff states that the ALJ discounted the medical opinions in the record and "erroneously substituted

her opinion as to [Plaintiff's] physical ability to perform work activity." (*Id*. at 11).

Further, Plaintiff argues that the ALJ erred in dismissing Dr. Danopulos' opinion as

"unremarkable with only findings of arthralgias/neuralgias (pain) but no medically

determinable impairments," because the National Institutes of Health recognizes

arthralgia as a medical condition. (*Id*. at 10).

At step two of the sequential evaluation, the ALJ must determine whether a

claimant has a "**severe medically determinable** physical or mental impairment … or a

combination of impairments that is severe." 20 C.F.R. § 404.1520(a)(4)(ii) (emphasis

added). In other words, step two does not call for identifying 'medical conditions,' but

specifically requires an impairment that is: (1) severe; and (2) medically determinable. In

order to be 'severe,' an impairment, or combination of impairments, must "significantly

limit(s) [the claimant's] physical or mental ability to do basic work activities."[4] 20

C.F.R. § 404.1521(a). In order to be 'medically determinable,' an impairment must result

from anatomical, physiological, or psychological abnormalities which can be shown by

clinical and laboratory diagnostic techniques and established by medical evidence

consisting of signs, symptoms, and laboratory findings, and not just by a claimant's

statements of symptoms (*e.g.*, pain). *See* 20 C.F.R. § 404.1508.

---

[4] Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." 20
C.F.R. § 404.1521(b). Examples include: "(1) Physical functions such as walking, standing,
sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacity for seeing, hearing,
and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of
judgment; (5) Responding appropriately to supervision, co-workers, and usual work situations;
and (6) Dealing with changes in a routine work setting." (*Id*.)

Here, the ALJ's decision acknowledges that "[BDD] reviewing physicians found severe physical impairments with back pain due to degenerative disc disease of the lumbar spine and limited reaching with right upper extremity." (Doc. 6, PageID # 75). However, the ALJ gave little weight to these findings, stating that they are not supported by the medical evidence. (*Id.*) The ALJ articulated the basis for her conclusion, stating that:

> X-rays of the claimant's cervical spine and left shoulder were negative (Exhibit 16F). X-rays taken on January 26, 2011, of the claimant's lumbar spine showed only mild spondylosis at L3-L4 (Exhibit 7F). The claimant complained of heel spurs and foot pain; however, x-rays showed plantar fasciitis and the doctor recommended foot exercises (Exhibit 10F). Likewise, the claimant alleges problems with her right shoulder and has visited the emergency room many times but x-rays are normal (Exhibit 13F). Clinical examinations of the claimant have consistently shown no significant physical findings (Exhibit 10F/5, 9; 13F/3). These negative findings are reflected in the physical examination performed by BDD consultative physician Dr. Danopulos, which was unremarkable with only findings of arthralgias/neuralgias (pain) but no medically determinable impairments; his opinion that the claimant's opinion that the claimant's arthralgias/neuralgias negatively impact the claimant's ability to do work related activity is vague, inconsistent with his normal clinical examination findings and therefore not given significant weight (Exhibit 7F).

(*Id.*)

Thus, the ALJ provides a thorough explanation for concluding that any findings of severe physical impairment are unsupported by the objective medical evidence and, therefore, not medically determinable. Further, the Court notes that Dr. Danopulos' opinion that Plaintiff's "ability to do any work-related activities is affected in a negative way," says nothing about the severity of Plaintiff's arthralgia or the degree of limitation

Plaintiff's arthralgia would cause, thereby supporting the ALJ's conclusion that his opinion was vague (in addition to being inconsistent with the objective evidence).

Thus, the ALJ's decision was based on a thorough review of the administrative record, is in line with statutory and regulatory requirements, and is supported by substantial evidence.  Accordingly, the ALJ did not err in determining that Plaintiff did not suffer from a <u>severe and medically determinable</u> physical impairment.

### B.  Disability Based on Mental Impairment or Combination of Impairments

Next, Plaintiff argues that the ALJ "erred in finding that Plaintiff was not disabled by her mental impairments, or, at the very least, the combination of her mental and physical impairments."  (Doc. 7 at 11).  In other words, Plaintiff argues that the ALJ erred in her RFC determination based on Plaintiff's severe mental impairments and non-severe physical impairments.  Plaintiff argues that the ALJ erroneously rejected the opinions of treating physicians, and relied instead on the reviewing opinions of state agency physicians and a "mischaracterization of [Plaintiff's] daily activities to find that her mental impairments were not disabling."  (*Id.* at 11-19).

The Regulations require that a treating physician's opinion be given "controlling weight" if "well-supported" by objective evidence.  20 C.F.R. § 1527(d)(2); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007) ("the opinions of treating physicians are entitled to controlling weight").  More weight is generally given to treating sources because they can provide a detailed, longitudinal picture of one's medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from objective findings alone or from reports of individual examinations such as

consultative examinations.  *Id.*  However, '[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record.'"  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *2 (July 2, 1996)).

To determine how much weight to give an opinion, the ALJ "must apply certain factors – namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (discussing 20 C.F.R. § 1527(d)(2)).

As an initial matter, Plaintiff's assertion that the ALJ 'mischaracterized' her daily activities is not well-taken.  First, the ALJ's assessment of Plaintiff's daily activities arose under step three of the evaluation in which the ALJ concluded that Plaintiff does not meet the relevant Listings.  (Doc. 6, PageID ## 75-76).  However, Plaintiff conflates this assessment with the ALJ's articulated basis for her RFC determination.  Moreover, Plaintiff fails to recognize that one of the ALJ's primary concerns with Plaintiff's allegations was her credibility, thus rendering her reliance on those allegations here unavailing and dismissive of the ALJ's substantive determination.[5]

---

[5] Credibility will be addressed in Sub-Section C, *infra*, of this Report and Recommendation.

Next, as to the weight given to treating physician's opinions, Plaintiff contends that the ALJ erred in rejecting the opinion of Drs. Kramer, Brumfield, and McConnell, and relying on those of the BDD physicians.  (Doc. 7 at 14-19).  As to Dr. Kramer, the Plaintiff argues that the ALJ should have relied on his opinions that Plaintiff suffers from "marked impairments."  (*Id.*)  However, Plaintiff's arguments would assume that a 'marked impairment' or 'limitation' is the equivalent of a disability <u>as defined under the Act</u>.  This is not the case.  Instead, such limitations are considered in making an RFC determination.  20 C.F.R. § 404.1545(a)(1).  And, in the instant case, the ALJ did just that.

Indeed, the ALJ found that Plaintiff's mental impairments were severe and that Plaintiff was further limited in her ability to deal with high stress work.  (Doc. 6, PageID ## 77-78).  This conclusion is entirely consistent with and responsive to Dr. Kramer's opinions and observations that Plaintiff has poor stress and frustration tolerance.  (*Id.* at 588).  Moreover, Dr. Kramer never opined that Plaintiff is entirely unable to function due to her mental impairments.  In fact, he stated that Plaintiff had the mental ability to perform simple and repetitive tasks if it did not involve too much social interaction.  (*Id.* at 593).  To the extent that the ALJ gave little weight to Dr. Kramer's caution regarding social interaction, the record, including Dr. Kramer's own notes, appears to support the ALJ's decision.  Notably, Dr. Kramer's notes state that Plaintiff acknowledged being "okay" with public interaction.  (*Id.* at 586).  Finally, Plaintiff's assertion that the ALJ discredited Dr. Kramer's opinion based on its inconsistency with the BDD assessments is inaccurate.  The ALJ gave Dr. Kramer's opinion "little weight" because the inconsistency

of the record evidence (which Dr. Kramer himself notes on occasion), as well as issues of
Plaintiff's credibility, undercut the basis for his assessment.  (*Id.* at 79-80); *see Lunsford
v. Astrue*, 2012 WL 1309265, at *4 (S.D. Ohio Apr. 16, 2012) (Kemp, M.J.) ("if an ALJ
finds … subjective reports to be unworthy of complete belief, any medical opinion based
on such complaints may also be discounted") (citing *Allen v. Comm'r of Soc. Sec.*, 561
F.3d 646, 652 (6th Cir. 2009)).  Accordingly, the ALJ appropriately chose to give little
weight to Dr. Kramer's opinion.

As to Drs. Brumfield and McConnell, the ALJ gives no weight to their opinions,
largely for the same reason—both physicians opinions were based on Plaintiff's
subjective complaints and provided no objective medical evidence in support of their
conclusions.  (Doc. 6, PageID # 79).  It is well-settled that "a doctor's report that merely
repeats the patient's assertions is not credible, objective medical evidence."  *See, e.g.,*
*Poe v. Comm'r of Soc. Sec.*, 342 F. App'x. 149, 156 (6th Cir. 2009) ("substantial
evidence supports the ALJ's determination that the opinion of [the claimant's] treating
physician, was not entitled to deference because it was based on [the claimant's]
subjective complaints, rather than objective medical data.").  Additionally, the ALJ
appropriately discounts Dr. Brumfield's opinion regarding Plaintiff's mental
impairments, noting that "Dr. Brumfield is not a mental health specialist but a general
practitioner."  (Doc. 6, PageID # 79); *see* 20 C.F.R. §404.1527(d)(5); *see also Cathcart v.*
*Astrue*, No. 3:09-cv-420, 2011 WL 830180, at *12 (S.D. Ohio Jan. 10, 2011) (the ALJ
"did not err by discounting [physician's] opinion that [the claimant] could not work due

to his alleged mental impairment, because [the physician] is not certified in the area of
mental health treatment").

Accordingly, the ALJ appropriately articulates her reasoning for discounting the
opinions of Drs. Kramer, Brumfield, and McConnell, and her decision to do so is
supported by substantial evidence.  Further, the ALJ's reliance on the BDD assessments
was because they were well-supported and consistent with the evidence as a whole.

### C. Credibility Determination

Finally, Plaintiff contends that the ALJ also erred by relying on Plaintiff's level of
daily activities and her "drug seeking behavior," as a basis for finding Plaintiff was not
credible.  (Doc. 7 at 19-20).

In making a determination of disability, "an ALJ is not required to accept a
claimant's subjective complaints and may properly consider [the claimant's] credibility."
*Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).[6]  The Court must
"accord the ALJ's determination of credibility great weight and deference particularly
since the ALJ has the opportunity … of observing a witness's demeanor while
testifying."  *Id.*  To appropriately evaluate the credibility of an individual's statements
regarding subjective symptoms "the adjudicator must consider the entire case record and
give specific reasons for the weight given to the individual's statements."  SSR 96-7p.   In
making this determination, "[o]ne strong indication of the credibility of an individual's
statements is their consistency, both internally and with other information in the case

---

[6] Subjective complaints may "support a claim for disability, if there is also objective medical
evidence of an underlying medical condition in the record."  *Jones*, 336 F.3d at 475-76.

record."  *Id.*  "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence." *Walters*, 127 F.3d at 531 (citing *Bradley v. Sec'y of Health & Human Servs.*, 862 F.2d 1224, 1227 (6th Cir. 1988)).

Here, the ALJ found that Plaintiff had severe, medically determinable mental impairments.  (Doc. 6, PageID # 74).  After careful consideration of the evidence and "with benefit of the doubt to the claimant," the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."  (*Id.* at 74, 77).  In making this credibility determination, the ALJ properly relied on the record evidence, including objective medical findings and Plaintiff's own statements.

First, the ALJ noted that "[w]hile the claimant has been diagnosed with depression and anxiety, treatment records do not support the severity of the symptoms alleged."  (*Id.* at 77).  The ALJ cited specific medical records that indicated that Plaintiff's anxiety and depression was under control while she was seeking treatment and her prescribed medication (*i.e.*, hydroxyzine and Cymbalta).  (*Id.*)  Further, the ALJ states that Plaintiff "alleges difficulty with her memory and focusing but she is able to engage in activities of daily living that substantiate that these problems are far from disabling."  (*Id.*)  With regard to inconsistencies in Plaintiff's allegations, the ALJ explained that:

> At the hearing, the claimant's testimony regarding her activities of daily living was very vague.  She stated that she could not remember what she did the day before the hearing.  The claimant can feed and dress herself.

> She testified that she does not cook much but uses the microwave to heat up
> tv dinners. She goes grocery shopping at the beginning of the month. She
> does the driving in the household. She admitted that she lives in a run-
> down house owned by her boyfriend's mother and that she and her
> boyfriend are "fixing up" the house. However, in a function report dated
> November 6, 2010, the claimant reported that if she had the energy, she
> cooked dinner, washed dishes, and did the laundry. (Exhibit 6E). She took
> care of a cat, i.e. feeding and cleaning out litter box. She shopped for
> groceries. She could mow the grass if it was not too hot outside.

(*Id.* at 75-76).

The ALJ also stated that Plaintiff's credibility is diminished by her "history of drug seeking behavior and not being truthful with her physicians," noting that despite Plaintiff's allegations of "disabling mental impairments, in the past she has declined mental health treatment." (*Id.* at 78). The ALJ cites to the ample record evidence suggesting that Plaintiff is primarily concerned with obtaining Xanax and other benzodiazepines from the various medical sources she encounters. (*Id.*) Indeed, Plaintiff herself admitted on multiple occasions that she had been purchasing Xanax off the street, and the medical records indicate that she becomes hostile when doctors refuse to prescribe the medication for her. (*Id.*)

The ALJ also noted that her own observations of Plaintiff at the hearing served to diminish Plaintiff's credibility. (*Id.*) The ALJ astutely observed that Plaintiff's "testimony was very vague and rambling at times but would become very focused and alert when [Plaintiff was] asked about inconsistencies in the record, i.e. drug usage." (*Id.*) Further, Plaintiff "testified that she has never used illegal drugs; however, the record documents that she admitted to a history of cocaine use and was diagnosed with poly-substance depending in November 2007." (*Id.*) Finally, the ALJ stated that

Plaintiff's prior theft offense "also brings into question the reliability and truthfulness of her disability allegations." (*Id.*)

In sum, the ALJ's assessment of Plaintiff's credibility was based on her thorough consideration of the entire record, is supported by substantial evidence, and, therefore, is not erroneous.

## V. CONCLUSION

Based upon the foregoing, the Court believes that there is substantial evidence supporting the ALJ's findings at each step of the sequential evaluation, including her ultimate decision that Plaintiff was not disabled under the Act. Accordingly, this Court RECOMMENDS as follows:

1. The Commissioner's non-disability finding be AFFIRMED;

2. The case be terminated on the docket of this Court.

Date: 1/7/2016                                     *s/ Sharon L. Ovington*
                                                   Sharon L. Ovington
                                                   Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days if this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).